Final case for argument this morning is 12-1419 Tampa Bay Fisheries, and we have a different counsel. Are you Mr. Kinkle or Mr. Hanson? Mr. Kinkle. Mr. Hanson. Thank you. And you were also on the brief. I was. I appreciate that. I was just delayed by the snow and I wasn't sure I was going to be here on time. May it please the Court, I'd like to begin by offering a correction or clarification of the record. When I was preparing for argument yesterday, I was able to confirm that one of the plaintiffs, Tampa Bay Fisheries, did check the opposed box in the ITC questionnaire, the final ITC questionnaire. Now in our briefs and below, we contend that we didn't know, but we did confirm that yesterday, so I wanted to make that clear. And what about Singleton? Singleton, we were not able to confirm. Now, what's the relationship between Singleton and Tampa Bay? They do share a common parent company. I'm sorry, I didn't mean that. They do share a common parent company, Singleton. And you're treating them as essentially the same entity for purposes of this appeal, I take it? Yes. Do you know whether or not the same individuals prepared the responses for both entities? I don't know. Did you make an effort? I know you don't have your copies, a copy of the questionnaires that were submitted, but did you make an effort to obtain those at any point? Yes, we did. We certainly asked our client for them. Our client did not take them. You couldn't have them? Why didn't you get them? We were told they did not have them. You didn't have them. Right, and we didn't represent them. Did you make an effort? I mean, did you make an effort to get them from the government? Frankly, I don't know. I can tell you how I found them yesterday. Well, you actually have the questionnaire response, the full questionnaire, or just the box? No, no, no, just the box. And just for Tampa Bay? Just the one parent with the box and just for Tampa Bay. And how did you find it? It was on the IPC website in their EDIS system. I thought your argument was that because this was decided on a preliminary motion, that you never had the opportunity to take discovery from the government and to obtain the document. That was our understanding at the time. I just know that when I was preparing for argument, I was able to confirm that they did check the opposed box. But the court below assumed that they did not check the support box, so I don't think it had any impact on the court below. Well, let me ask you that. Do you think that makes a difference to your argument, whether they took a neutral position in the face of responding to the questionnaires or took an actual opposition position? I don't think it makes a difference. The reason is that in this case, unlike Ashley or the earlier case of SKF or Shea Sydney, we only have, you know, the record is just that list of documents. That's what was filed by the commission. It's just a list of documents, and that's all we have in terms of a record. Now, it says you can go look at the website. You might be able to get access to some of them, which we don't. So you're saying because it was the government's burden to prove that you opposed it, so they were the ones that had to come forward showing your opposition? They were under an obligation to file the record with the court. If it's review on the record, they're certainly under an obligation to do that. And also, even if we were able to find in our client's files some version of a questionnaire response, they undergo revisions. There were one or two questionnaire responses and several revisions on the list filed by the ITC. Now, we don't have access to all of those because some of them are confidential, so we can't get access through the website. That's why we can't confirm whether or not Singleton did anything differently than Tampa Bay. To go back to my first question, I mean, yes, you can't get the questionnaires, I guess, from the website. And yes, you didn't have formal discovery. But I want to make sure, you didn't make even an informal request of the ITC, please give us copies, we don't have the copies, we need them. No such request was made, is that right? That's correct. Does that, I mean, if we were just working on a completely clean slate, would that, in your view, make a difference to the First Amendment argument, whether there was an affirmative opposition or simply the absence of a statement of support? No. Even with an affirmative opposition, we still believe the way this was applied to Tampa Bay and to Singleton was unconstitutional. The reason being that in this case, all you've got is the box. You've got that one page, one page from the questionnaire. Now, a questionnaire is not just one page. A questionnaire is dozens of questions, many of which require a narrative response. So there easily could be an explanation of why they oppose, which may indicate that they nevertheless support the petition. So there may be some explanation in there. There are lots of narrative responses and questionnaire responses. We don't have any of those. The ITC didn't submit them, didn't list them. So all they listed was that one page. So that's all we've got in this case is one page which says oppose. So the question before this court is different than it was in Ashley or in Shea Sidney or in SKF. That is, do you only – is the box all you need? And the government, Justice Department, on page 16 of their brief says yes. The government says they set up a two-part test. One part is did they – It's not a question of Ashley saying is the box all you need, but as I understand it is that in SKF they said the box is not enough. You have to have something more. In Shea Sidney they found that there was something more, which included at one point checking a box. But then in Ashley Furniture they said the something more is not enough. You have to have the box, didn't they? Well, you certainly could read it that way, but the court had the whole record before. I would assume that the court looked at the whole record and said if you look at the whole record, there was nothing else to dispute what was checked, what the box indicated, so we're going to go with a box. That's true, but I think that begs the question. An important part of our constitutional argument is the subsequent Supreme Court decision, subsequent to Ashley that says you can't burden more speech than is necessary to carry out the government purpose. You can't sacrifice speech for convenience. And that's clearly what the ITC did here. They said, well, we've got to figure out this support thing. Well, look, they've been checking this box for years. We'll just use that. So they placed this huge new burden on that speech, which prior to that case had been used as an element in their injury analysis. But now you've got this new burden on that one question in the questionnaire responses. You oppose, you don't support, you go neutral. That's going to determine whether or not you qualify for a benefit. Let me see if I understand what you're suggesting that could count as support if we had the questionnaire. And your argument in your brief at various points suggests that you filed several, a number of 10, I guess, is the number you have listed, questionnaire responses. Is your argument that merely responding with factual information that is requested in a questionnaire is enough to constitute support? Or is it that there may be statements in the questionnaire indicative of support that would constitute support? Yes. It's the latter, not the former. There may be statements. As I said, there are lots of narrative responses. Now, who in your view bears the burden of just coming in and asking for a Burt Amendment payment? Who bears the burden of establishing the requisite predicate for that payment? Well, I think when you're – now, this is after the ITC investigation. Let's say, you know, the ITC, you say, hey, there's a payment. You write the ITC. You say, we want to be paid. And they come out with a letter, and the letter says no. Now, do you have the burden under those circumstances to show that there is a record-based reason that you should win and that they should not be able to sustain their note? Well, I think there is some burden. We certainly have to show we've incurred qualifying expenditures. We have to show that we were a domestic producer, that we're still in operation. There are certain requirements that we have to show. Well, the statutory requirement is to show support. Right. Do you have the obligation, the burden of establishing whatever the predicate is that's necessary to show support? Well, I don't think so because the ITC has all the information within its control to make that determination. And I think that's why we cited the NAM decision of the D.C. Circuit is because when you have an agency that has all the information they need to make a support determination, you can't then require – you can't compel speech on the part of some private party to say yes or no. That's what the NAM decision says. That's how I think the Supreme Court would analyze this case, if it did. So let me just take it. So your view is that you file and then the government – so what, in your view, would have been sufficient for the government to come forward with in order to dislodge your entitlement to the Byrd Amendment? Well, I'm not sure, but they could not rely on that speech. If they relied on that speech, then they had the burden to come forward and show – But they didn't rely on that speech, so they couldn't rely on anything in the questionnaire or just the checkboxes? They could have analyzed the entire record and maybe made a determination of whether there was reason that this party should be included in the domestic industry or not. And, in fact, the commission does that in every case. If you look, the commission always makes a determination in every case whether or not some U.S. producer should be excluded from the industry because of a foreign affiliation. They make that decision in every case. But the statute requires the showing of support, right? So you're saying they should look at – Well, in terms of support through questionnaire response. So it's certainly conceivable that the statute could have been interpreted to say you filed questionnaire responses, you supported the effort, you participated. Well, but I think in response to me, you said that just filing a factually accurate questionnaire response would not be support, right? Under the case law now, that's not true. But I'm saying if we had – if this was – if we were starting from a fresh slate, then I would say that we – you know, if we demonstrate we're a producer and we've incurred the qualifying expenditures, we were not excluded from the industry during the initial investigation, there's no reason to exclude us now. Well, but you just written the support requirement out of the statute altogether, right? No, no. We supported by filing the questionnaire response. But you're obliged to file the questionnaire response. That's a legal obligation, right? You can't say we choose not to. Isn't 19 U.S.C. 1333 required to file that? Actually, many do choose not to. Well, but they're obligated to. It's up to the agency to enforce. I mean, if the ITC – No, it's up to the agency to enforce. But the agency has a legal right to enforce it, right? It has a legal right to enforce, but – So you have a legal obligation to produce it subject to the agency's decision not to enforce, right? I mean, if you get a subpoena from the United States District Court, you have an obligation to show up. Now, maybe somebody won't choose to enforce the subpoena, but you have an obligation. This is like a subpoena, right? No, it's more like a discovery request because that is what you're doing. You're asking a potentially neutral third party for information. You can – it's just like a civil litigation. You can issue a discovery request to somebody, and if they don't comply, you can try to get it enforced. But sometimes you do, sometimes you don't. Okay, well, suppose that it were to turn out that the questionnaire responses all were merely factual and didn't have anything in them from which one could infer one way or the other as to whether you support. They simply said, we produced this amount. We have – these are our prices, these are our sales, whatever the information is in the questionnaire response. Would that constitute support? The agency could make that determination. But if you're using the reward analysis – in the questionnaire response was not a showing of support, would that be legally erroneous? As a matter of law? Yeah. Not under the current case law? So if we were to go back, send this case back, let's say, hypothetically to the trial court, and the trial court were to look at the questionnaire response and find nothing in there that said, in effect, we support the petition, then you would lose. I'm not sure about that because I think in that case, on the complete record, what I would argue, as we did in our brief, is that if the agency has made a determination not to exclude these people from the industry by virtue of their foreign affiliation, despite being required to do so, then they shouldn't be excluded. Maybe they could be excluded if they actively opposed, if they subverted the process. But I think if they cooperated in the investigation, and then at that point, I think they've indicated their support through questionnaire response, then that's all the statute requires. The statute doesn't say anything about boxes. So you really are coming around to the position that I thought you disclaimed earlier in response to my first question. You really are saying, as long as you file a questionnaire response that's a complete response, you're entitled to payment. And we're not excluded, and we are an industry member, not excluded by virtue of our foreign affiliation. I would say yes, we're entitled to payment. And you could show injury, I assume. I assume you agree you'd have to show that you were among those injured. Not individually. That's sort of one of the unfortunate things here, is when a petitioner files, they file on behalf of the entire industry, all U.S. producers. So they're acting on behalf of an industry. And then afterwards, you're carving it up and say, we're going to reward some industry members and some not. And then we're going to punish some employees because their employers exercised their First Amendment rights. I don't see the fairness there. I don't see why those employees should suffer because their bosses said they opposed. Well, your argument sounds very like the dissent in Ashley Furniture. Yes. And isn't it a problem that it's a dissent in Ashley Furniture? It is a problem that it's a dissent. But the facts are different. What the dissent said was it invites serious constitutional questions. And I think that's what you've got here because all you've got is that expression of an opinion to hang your hat on. Not you, but for the agency to defend itself. They're saying that this is consistent with the First Amendment because we're relying exclusively on that opinion expressed there to deprive you of the benefit. Isn't it a fact that in Ashley Furniture a majority concluded that there must be an affirmative expression either through the checking of a box or the submission of a separate letter saying we are affirmatively in support? Yes. Isn't that what they said? That's what they said. So how do we as a panel do anything with that? Well, I remember the court in Shea-Sydney said that was an unreasonable approach. So there's at least some difference. I thought Shea-Sydney preceded Ashley Furniture. It did precede. So there's some difference of approach, let's say, between the two decisions. And you've got a subsequent Supreme Court decision that says if you're going to compel speech that way, you've got to go that additional step. And it's the government's burden to show. So you place the burden entirely on the petitioning party when it's the government who is now imposing that speech requirement, a content-based speech requirement. And it's their burden in that circumstance. If we allege they violated our First Amendment right, they have the burden of demonstrating that it's the least burdensome alternative. And that's what the Supreme Court does. What's the key language from the Supreme Court that you rely upon? It's not to sacrifice speech for convenience. And that's exactly what's been done here, to sacrifice speech for convenience. Okay. Why don't we hear from the government? We've exceeded your time. We'll restore three minutes for rebuttal, and we'll add four minutes to the government's time, and you all can figure out how you want to split that. Mr. Tomilson. Thank you, Your Honor. May I please report? Your Honor, appellants have gone to great lengths to try to distinguish this case. But the reality is that this case is on all fours with Ashley Furniture. They've tried to recharacterize certain things. But what Ashley Furniture had, you had two appellants that did not affirmatively express that they supported the petition who were trying to claim that, well, we may not have affirmatively expressed support, but look, we submitted all these questionnaires that were very helpful to the investigation and the petition and the ultimate outcome. Therefore, we should be petition supporters. This court, a panel of this court in Ashley Furniture said, no, that's not enough. You have to affirmatively express support for the petition. And when saying that, this court specifically referenced to the three options on this specific questionnaire. But if the holding in Ashley Furniture is, as your friend on the other side argues, inconsistent with a different holding in Shea, Sydney, which is this panel bound by? Well, Your Honor, I reject the premise of the question because I don't – it seems clear to me that it's not inconsistent. These aren't two separate lines of cases where the Ashley Furniture Court hadn't – wasn't aware of Shea, Sydney or had not considered Shea, Sydney. It specifically considered Shea, Sydney and specifically considered the idea of whether its holding was inconsistent with Shea, Sydney, did go into a discussion of that and said it's not inconsistent. And I would also point out that the Shea, Sydney case on page 1381 of the Shea, Sydney case was characterizing the relevant test of SKF. It specifically said, in SKF, we noted that while a bare statement of support was insufficient, such a statement would be enough when combined with the activity of responding to questionnaires. And so that's the same test we're articulating here. As Your Honor pointed out, a bare statement of support may not be enough on its own, but it is necessary. This Court said it in footnote 26 of SKF. It certainly said it several times in the Ashley Furniture decision that it's not enough to simply say yes, we support and then violate your legal duties under section 1333 by not participating by submitting a questionnaire. But it's certainly a necessary prerequisite for CDSOA distributions. And that's the controlling fact in this case because appellants go to great lengths to try to make a big deal out of what was in the record, what was not in the record. The fact is under Iqbal and Twombly, under the pleading standard, they had to allege we affirmatively expressed support for this petition. Nowhere in their complaint, nowhere in their briefing, they don't allege that because they can't allege that. They never made an affirmative allegation that they expressly expressed support for this petition. And that was a required element of their claim to recover CDSOA distributions, and they didn't do it. There is language in Shea Sidney that says – I mean it sounds like a holding because it says we hold that when a U.S. producer assists in an investigation by responding to questionnaires but takes no other action prohibitive of opposition or support, the producer has supported the position and is eligible. That seems to be inconsistent with Ashley Furniture, does it not? Perhaps reading that in isolation, Your Honor, maybe. But I think earlier in that decision that Shea Sidney Court specifically noted that this – and noted several times that the appellant Shea Sidney had in response to the preliminary questionnaire specifically said, yes, we support this petition. And I would also note that this – the court in SKF, if that – essentially that can't possibly be – it can't possibly be the rule that simply submitting a questionnaire is enough. And the reason it can't possibly be sufficient is because for one, as Your Honor pointed out, it completely reads the support requirement totally out of statute. Well, it doesn't say just a questionnaire is enough. That sentence at least says, and takes no other action prohibitive of support or opposition. So it's unlike SKF where there was an oppose, right? Right. So it's not just questionnaires and nothing else. It's questionnaires and no other indication of support, which is what the sentence I read just says, right? Well, I suppose. But again, earlier in that decision, this court in Shea Sidney specifically noted several times and discussed in some detail the actual responses that Shea Sidney gave to the questionnaire and specifically said that Shea Sidney had expressed support. And this court specifically noted in response to this questionnaire response that a producer's expression of support in the response to the preliminary questionnaire is critical to the determination of whether to commence an investigation of an anti-Dunphy petition. That was at page 1382. And so this court was emphasizing and placing great weight on the fact that the petitioner in Shea Sidney had specifically expressed support for the petition in its preliminary. Do you want to touch on the discussion your friend had with Judge Bryson and others regarding who's got the burden of moving forward and coming up with information, et cetera? Can you address that for a few minutes? Sure, Your Honor. I'd be happy to. Because – and I think this comes back to what I mentioned a second ago, the Iqbal-Pombley standard, that here we have a case that was decided on a 12b-5. And so the court dismissed this correctly for a failure to state a claim upon which relief can be granted for the specific reason that, as I mentioned earlier, they have never alleged that they affirmatively expressed support for the petition. And so that was a required element of their claim for CDSOA distribution. If they had done that, then we may be talking about something very different here because they would have established that element and they would have triggered certain discovery obligations. But given that they did not plead a required element of their claim, the government and the ITC both moved to dismiss under Rule 12b-5. And because they had failed to plead this essential element of their claim, the trial court correctly dismissed their claim under Rule 12b-5. And so here we never even got to the stage where there was any kind of official obligation to produce these records because they hadn't alleged that they indicated support. What about the argument that things that the Supreme Court said in McClellan after Ashley should impact our interpretation of the First Amendment issue here? Well, yes, Your Honor. And first and foremost, I would point out on this, in their brief, Tampa Bay Fisheries never actually references their First Amendment claim in their initial brief. It was true that they pled an as-implied First Amendment claim that was dismissed. But in their initial brief to this court, they never actually appealed that dismissal. And so certainly the government's position is they waived that argument. They waived the dismissal of their First Amendment claim. To the extent that this court decides that it is properly before the court, and this is my first opportunity to address it, I would certainly emphasize the fact that this McClellan v. Coakley involved a very, very different set of circumstances and a very, very different test. McClellan v. Coakley involved a Massachusetts state law that placed restrictions on who could be near abortion clinics on public roadways and sidewalks. And so there you had individual speech that was very political, very religious in nature. And there the court – that's just a very different circumstance because it involved a time, place, and manner restriction. It did not involve any restrictions on commercial speech whatsoever. And so we would certainly argue that that's completely inapplicable to this case because it involved a completely different test and a completely different circumstance. I would also point out to the court the other case that Tampa Bay has referenced is National Association of Manufacturers v. SEC, which was the D.C. Circuit case that was decided this past year. That case involved a compelled speech circumstance, which we would certainly argue does not apply here because nothing in this statute actually required any specific speech on behalf of the petitioners. And more importantly, I would – But I mean it did require very specific speech if they wanted to participate. It rewarded very specific speech. That's very different than compelling it, saying you have to make this speech. And the facts on that case were that it involved, I believe, jewelers saying you have to represent the country of origin, you have to represent that this is conflict-free in order to sell it. That's a very different circumstance than this when we're saying, as the SKF court expressly noted, you're free to go out and say whatever you want, especially outside the context of this proceeding. You can say you oppose the government's enforcement efforts of the trade laws generally, specifically with regard to this. You're just not going to get rewarded, and the reward construction was what was adopted by this court in SKF. And I would just like to also emphasize there was another case by a D.C. circuit called American Meat Institute versus Department of Agriculture, which was 760F3-18. That case was an en banc rehearing of both the National Association of Manufacturers case and several others. And the way I read that case, they actually vacated and overruled the First Amendment portions of the National Association of Manufacturers case. Can I just follow up on your waiver point, though? If it is the case, and I think it may be in this circumstance, that they didn't raise it in blue, the law was Ashley Furniture and so forth. And then in gray, they do raise the argument, and they piggyback it on the Supreme Court's recent decision in McCulloch. So if, in fact, there is an intervening Supreme Court decision that resurrects the notion that there's a First Amendment claim here, is it really off base for them to have included this argument in gray? Well, we would argue it is, Your Honor, because it goes to their First Amendment claim, which was dismissed by the court, and they never – they didn't raise it here. We would argue that this is – what's on appeal before this court is a purely statutory argument. And therefore, the First Amendment, since they haven't raised – properly raised it before this court, is not relevant. But again, I don't – whether the court needs to get to it or not, I don't think there's any substance to it because the McCulloch versus Coakley case is so vastly distinguishable. You mentioned a moment ago that they had not asserted in their complaint that they supported the petition, but they do in count five. They say – plaintiffs argue that they supported the petition, right? I mean, yes, and I may have misspoke. They make this allegation that they have somehow supported the petition essentially by submitting a questionnaire. But they never specifically say we affirmatively stated that we support the petition. Well, okay, but then if they do say that they support the petition, that raises the question of what is necessary to constitute support. And my next question is have you viewed the questionnaires, by the way? Have you seen them? I have seen them, not in this case, but I've seen questionnaires in other cases. You haven't seen the questionnaires in this case? So we don't – as far as you're concerned, you have no idea what they say. They could – for that matter, Singleton, I guess, could have checked the box that says support. I have not seen the questionnaires in this case. All right. In the – I have not viewed – I guess I've seen some of these questionnaires, but I haven't seen a whole raft of them. So is there room in the questionnaires for statements that would be interpretable as indicating support for a petition? Not as a matter of logic, Your Honor. A purely factual – calling for purely factual information. Essentially, yes, Your Honor. This is the one single question in these questionnaires that's targeted to whether or not they support the petition. Essentially, most of the rest of the petition is more or less a data dump, asking them for – give us your data about sales, damages, harm, things like that. And it's asking for a lot of information in that. But this – I can't say that somebody couldn't try to shoehorn a statement in, but the only logical place would be in response to this specific question, because this is the only question that's specifically targeted to this issue of getting at whether or not a petitioner supports – excuse me, not a petitioner, whether or not a producer supports a petition. And we'd also – I would also note that this – even as far back as SKF, this court on page 1357 of that – of SKF says, the support requirement in the Byrd Amendment reflects the ITC's practice of asking questionnaire recipients to advise the ITC whether they support, oppose, or take no position on an anti-dumping petition. This support question is part of the ITC's material injury investigation. So even – this isn't some recent thing that this court just came up with in Ashley Furniture to try to tie this support requirement to this specific question. As far back as SKF, this court was specifically talking about that specific question. And we'd also note that when this statute was enacted, the ITC had 60 days to look at the hundreds of then-pending anti-dumping orders and make determinations as to each and every one of them, all the producers, as to who was the supporter. And it simply would have been unreasonable for Congress to expect the ITC to look through the hundreds of thousands of pages and try to somehow divine what the true feelings of all these producers were in response to the relevant petitions. When they had the specific question asking them whether or not they support the petition. Why don't we hear from Mr. Gallagher? Thank you, Your Honor. Good afternoon, Your Honor. Patrick Gallagher on behalf of the International Trade Commission. Have you looked at the materials? I am the right person, Your Honor, to ask that question. I finally got to be the guy from the Commission who got the Commission question. So you looked at the materials? Yes, sir. And if I could explain the business about it's on the record, it's not on the record first. And that is when we filed our administrative record, what we normally do, and this isn't just true for birth, this is true for trade cases in general, we file what's at the joint appendix at 004 to 008. It's a letter that says here is our record. It's an index and a certification. The index will have a description of the document tabulated for us. This is the one from this record. It looks just like this. In this corner here, there are numbers. They're from our electronic data imaging system. It's how we always file the records. They're public. In this case, they're public. The two questionnaire responses for Tampa Bay have been on the record since 2008 when we filed it. If you call up, you can go do it right now. You can call up that number. You'll see the Tampa Bay questionnaire response. Now, it is true that we inadvertently overlooked putting the Singleton questionnaire responses on the record for this case. Had we gone to briefing, we would have noticed that and it would have been corrected. Do you mean the whole questionnaire responses? No, sir. No, no, because – Just the – Yes, the relevant – what we call the relevant pages because, as Mr. Tomlinson correctly conveyed to you, we look at the questionnaire, but the questionnaire is essentially almost entirely questions about how you do business, what do you think about the imports, are you affected by them, things like that. What do you think about the imports? Certainly. Are you affected by them? Those questions are in the questionnaire? Those types of questions are answered in the questionnaire, but those types of questions go to the injury determination, not to whether you think it's a good idea to have duties or not, which is the precision support question. Wait, what about the Singleton thing then? I have Singleton. The problem with Singleton is that it's still business proprietary until Singleton waives the business proprietary status. So I can't tell you what it is. You can't tell us whether the box was checked or not? Right. That's business proprietary. I bet that they're going to waive objection to having – Then I would share that with you, Your Honor. I would be happy to share that with you if they would waive. Why don't we find out whether they're willing to waive with respect to the box as to Singleton? We'll certainly waive in the court below. Well, how about now so we'll know what's in the box and solve our problem? We'll waive. We'll waive. Waive. All right. Which did they check? Oh, you're waiving. Preliminary and final? Thank you. Take no position. Okay. So they are identically situated to Ashley and Ethan Allen in the prior case. Opposition, just like Ashley. Take no position, just like Ethan Allen. There is one other thing. I don't want to belabor all the points that Mr. Tomlinson has already done such a good job on. And it feels a little bit like deja vu when we did Ashley and Ethan Allen. But, Judge, you quoted that when we hold section, if you go to the next page in the same opinion where the court sums up its decision, it lists. It also, the elements that it considered were essential for that particular case. And that was driven because you had the unusual circumstance of the prelim being different from the final. That one of the elements that the court found were important was that it did indeed check, it did indeed express support in the preliminary questionnaire response. That was one of the elements in Shea-Sydney. So the requirement under the statute that there be an expression of support for a petition has held since SKF. Shea-Sydney is no different. The facts were a little quirky, so you had a little more analysis. But the requirement that there be an expression of support in the petition wasn't changed by anything in Shea-Sydney. It was just the unique facts of that case. And, of course, Ashley and Ethan Allen's court held that the requirement for the expression of support was in the statute. And it was what SKF saved in its saving construction. What do you say about the $22,000 that was advanced to the petitioner on behalf of the parties in this case to support the attorney's fees for the petition? There's two things to that, Your Honor. One is there's no way the commission can know those sorts of things. The statute doesn't contemplate anything outside the records from the original investigations. It even directs the commission to go to Commerce rather than conduct some sort of investigation on its own about what may or may not be the motives of domestic producers. We agree with the court below where it said, even if all this is true, which we have to assume under the 12B, that they did some pre-petition activities. When the question was asked of them directly during the proceeding, their response was, we oppose or we take no position. So whatever their motivations were for providing pre-petition support, on the record, that's not what they stated. And so that would be a rational basis for making a decision that you're not a petition supporter. We asked you the question, you said no. It would make more sense if they gave $22,000 and then they came in and said yes. Why they changed their mind, we don't know. And that's assuming that it's all correct. All those facts are substantiated. Now that, I take it Count 5 applied with respect to all of the countries except India. Is that right? Count 5 applied. Now Count 5 said that the $22,000 was indicated support for all of the various countries, China, Vietnam, Ecuador, but not India. So perhaps that's an explanation for why there's a difference between the support for some of the countries but non-support for the entire order. It could be, but it's still a question. Why would you provide financial support to a petitioner? And then when, and they go to all the trouble to do it and file papers and collect all the data. And then when you're asked a question by the commission, where you can have an effect on the investigation itself, you take a position that is contrary to your provision of the financial support in the beginning. I'm sorry. I was just going to say it just seems contrary to say, well, I'm going to give you money to file this position and I'm going to torpedo you as soon as it goes official. But maybe that's the point, torpedo you. So you're saying that the mere expression, the mere opposition, expression of opposition without any active opposition, it constitutes torpedoing? Well, a single producer can't usually, unless it's extraordinarily large, could not torpedo the investigation. No, but they're taking actions that are detrimental to the imposition of duties, which is the whole purpose. By merely expressing an opinion? By stating that they do not support the petition, either by saying we oppose or by saying we take no position. The commission considers that as part of its determination in the investigation, and it really becomes an issue if you've got related parties or something. So with the abstract expression of speech, take the one that says we take no position, but yet we're providing all this information, we're providing all this data. You think that that's actively torpedoing the investigation? No, no, no. I said that to juxtapose the obvious and obvious effort to support the petition in the beginning. I provided you monies to enable you to file this petition, but then when I was asked by the commission, what do you think of this? They said, oh, I'm not really that interested in that. That can have an effect in the investigation that could ultimately lead to no duties. Now the commission – I'm not sure I have the exact numbers right. The commission, I take it, cannot institute the proceeding if there's less than 25 percent support from the domestic industry. Is that right? I know there's a 50 percent requirement for quantity, but the 25 percent is for the various domestic producers. Is that right? The problem – it's not the commission that conducts that inquiry. A petition is filed. It's filed with the commission, and it's also filed simultaneously with Commerce. Commerce does that? Commerce does that. ITA does that, right? Yes. All right. They make a determination, but are they making that determination based on the box checked? No. All right. They can't because we're just sending out our questionnaires then. Okay. So they haven't gotten the questionnaires. How do they make a determination as to whether 25 percent of the domestic industry is in support? They're supposed to do it on the face of the petition. There should be an allegation from the petitioner. I represent X amount of production. These parties support me. Commerce will check up on that. If there's at least 25, then they start going forward from there. So if the number is not overwhelmingly more than 25, if it's close, they will actually go out and talk to these people? Yes. You have to have 25 percent on its face. Otherwise, Commerce just rejects it outright. If you have 25 percent on its face but less than 50 percent of the parties who respond to Commerce's polling – and I think we went through this last time, Your Honor. If you get more than the 50 percent threshold, then they'll initiate. We send the questionnaire. They have to do it in 20 days. We get our questionnaire back on day 35-ish, the preliminary. So we're getting our questionnaire response with this question about petition support from us after, much after Commerce has already done all its business. But Commerce is the one that makes the yay-go or no-go decision as to whether this initiation is going to go forward. So why does it matter? Why is it material to the investigation for you to know whether there's support or not support since the support and not support decision has already been passed on by Commerce? It's an element in the material injury determination to consider whether the industry itself feels aggrieved. I see. One final question. Am I right in my understanding that the questionnaire is not simply an invitation but is a directive with legally enforceable consequences if the parties refuse? There is language on the face of the questionnaire that suggests that. But that wouldn't do it unless there's language in the statute that says that. The irony is that, in my experience, and it's not necessarily universal, but in my experience, they're pretty good about coming back with a response. What I'm really looking for is, is there a legally compelled, compellable obligation to respond to the questionnaire factually and completely? And you can enforce that if you can go to court and enforce that if a party resists? Yes. Or simply doesn't want to? It doesn't happen very often for all the reasons that Mr. Oregon was saying. It's a long, complicated process. All right. Thank you. Thank you, Your Honor. Okay. In order to try to keep the time sort of even, why don't we give you seven minutes if you need it. Thank you, Your Honor. I'm not sure I'll need all that. First of all, I appreciate Mr. Bratt's explanation of the commencement process. And what you need to take from that is that these questionnaire responses, these ITC questionnaire responses, are entirely irrelevant to the commencement of an investigation. They come much later, and the Commerce Department never sees them, so they're irrelevant. I, in fact, have helped to prepare many ITC questionnaire responses. There's plenty of room for argument. There are dozens of questions in which you can express opinions about all sorts of things. So it's not limited to the box, and it's not a fill-in-a-blank questionnaire. It's not a multiple-choice questionnaire. There are lots of narrative questions or questions that ask for a narrative response, and you can put in lots of stuff in there, including your opinions about all sorts of things. What is your response to the government's argument that, though McCullen did come out after your initial brief was filed, you had a First Amendment challenge, an as-applied First Amendment challenge, that you didn't appeal? Well, I don't think that's true. If you look at page 37 of our brief, our opening brief, which was filed two and a half years ago, I think, if you just read the heading, the Tampa Bay's viewpoint by allegedly failing to check the support box does not disqualify from eligibility. So it seems to me that's an as-applied argument, that it involves the First Amendment. That's in our opening brief, and we're certainly explicit on that. What page were you referring to? Page 32, heading, just read the heading for Segment 3. You can see we raised the viewpoint issue at that point in our brief, our opening brief in this court, which was filed in July of 2012, so more than two and a half years ago. And there was a lot of subsequent judicial decisions between then and between the time we filed our reply brief. So certainly the arguments were refined since then. Well, it says – I mean, in this analysis it says – I mean, so far I'm not seeing any reference to anything other than – Well, certainly – Page 33, for instance, it says, based – by basing its eligibility on the viewpoint, blah, blah, they acted inconsistently with the plain language and the purpose of the statute. Well, I think that sufficiently raises the question of whether you can rely on an opinion to make a determination. Was there a reference to the First Amendment in here? I don't see it. I was looking carefully. Quickly, I didn't see it either. Also, what's your response to the government's argument that the complaint itself just simply fails to allege support? Well, it alleged – in Count 5, it alleged that we supported through questionnaire response, and that's what the statute requires. We allege that we satisfy the statutory conditions. We didn't allege that we checked a particular box one way or the other, but that's not in the statute. It says you can express your support through petition or questionnaire – or through petition or questionnaire response or letter of questionnaire response. We said we supported through questionnaire response. That's a sufficient allegation to raise that issue. That's what the statute says. What they're saying is we didn't check a box. We didn't mention a specific box or what we put in the box, and that's why our complaint is insufficient. And I don't think any court would approve that. Certainly, I hope not this one. Actually, Count 5, though, was limited, as I read it, to the $22,000 and associated documentation. I mean it was focused – it was not focused on the questionnaire response. And it was limited by country to a subset of all the countries. Right. I'm not sure why it was limited by subset. I'm going to guess there was an issue with India. Right. That's possible. So maybe they were importing from India. That's what I'm going to guess. But in any event, I think it's broad enough that we should be allowed to go forward with our case and see what the record holds. In that view, complaints are supposed to be read that way. We've certainly cited the statutory requirements. We've indicated we've filed questionnaire responses. The limited record we have shows that. So I think certainly there could be evidence in the record to support a finding that we supported. We expressed our support in the questionnaire responses or by filing the questionnaire responses maybe. That's a different legal question. But you've got to have the full record, and that's clearly different in this case. I think Chase Sidney said we've now given you three factual scenarios to allow the court to load and to resolve these issues. But they require the facts. We don't have all the facts. All we have is the box. So we've got to get the whole record before some court in order to make that decision. But I think what you – probably the most important thing that was said by the government was when Mr. Tomlinson said, look, we had hundreds of questions. We had hundreds of decisions to make in six months. So we used the box. So they did because it was the expedient thing to do. So they sacrificed speech for convenience. That's what the Supreme Court says you cannot do. And it's what he said they did. That's why this case, what they did to our client, violates the First Amendment. Unless Your Honors have any additional questions. Thank you. All rise.